Honorable Jamal N. Whitehead

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| DALE HARVEY,<br>    Petitioner,<br>v.<br>GARANN ROSE MEANS,<br>    Respondent. | No. 2:23-cv-01712<br><br>DECLARATION OF GARANN R. MEANS |

My name is Garann Rose Means. I am over 18 years of age and base this declaration upon personal knowledge of the facts.

**Continuance**

First and foremost, I ask the court to note that the evidentiary hearing on December 19, 2023 is due to take place on Z's sixth birthday. Dale has opposed a continuance knowing this, which shows his relationship to the children: if he is not involved, he sees no value or importance in aspects of their lives.

I have now seen repeated reference to my email address and how I must have been aware of this action because I was using my email address. My professional training and career are in web development, as are Dale's. Although the specialty is not a highly technical one, it does provide an advanced understanding of computer code and networking, such that most people in the field

DECLARATION OF GARANN R. MEANS
Page 1

understand common ways malicious computer code can be transmitted (EXHIBIT A-1). When I found emails from Dale's attorney, Maggie Smith, in my spam folder, I immediately recognized why they were there: they were from someone I'd never heard of, making vague and threatening claims (i.e., social engineering), telling me I must open an attachment to receive an explanation. For at least five months in 2019 and 2020, Dale was logging in to read my email (EXHIBIT A-2) while calling me crazy and abusive for suggesting he was doing so. When we moved out, and every time I took the girls on vacation, I got a flurry of email notifications about attempts to hack into my private social media accounts. If any online communication appears to be associated with Dale, I am even more suspicious of it than my professional training would cause me to be by default. I accept that emails were sent to me by Ms. Smith, but for widely accepted safety reasons, I didn't read them.

There is also an argument that I had notice of this action because of the times I encouraged the girls to call Dale or my filing for a protection order. Dale has the dates of those calls wrong (EXHIBIT A-3), and the protection order was requested based on him stalking us and gloating about stalking us.

I have been aware of the Hague Convention since Dale threatened that I would never see Z again if I tried to leave him in 2019. I had no definite notice this specific Hague Convention action was going ahead until very recently, when my family notified me that the anticipated process servers were looking for me and I emailed Karen Gailey to provide an address for service (lodged by Petitioner). I had continued to hold out hope that Dale would engage with the issues of why his family fear him, rather than force the children back into his care, knowing that's how they feel.

I was able to represent myself in Scotland because the legal action had gone on for so long that I had all sorts of example filings to reference. I would have preferred to have legal representation.

1  I had no success in representing myself, and was subjected to what felt like constant bullying by
2  Ms. Gailey. It is not my plan to represent myself now. I've found that having to read Dale's
3  filings myself is extremely upsetting, as it puts me right back into the fear and hopelessness I felt
4  in Scotland. I haven't yet been able to read all of them. My mom works in the legal field in
5  Seattle and has told me I'm extremely unlikely to find an attorney for a case of this nature this
6  late in the year. I was told by the only attorney I found with availability that the case would cost
7  much more than I have yet been able to borrow, despite me not hiring an attorney until I was
8  certain I had to in order to reduce costs.
9  I am submitting this declaration to provide a picture for the court of the circumstances and to
10 assure the court that I understand the gravity of the situation, however I have not had the benefit
11 of any legal advice. There are complex issues at stake and a very real risk of harm to the children
12 if they are returned to Scotland due to my incompetent pro se defense of my actions. It is in their
13 best interest that I be allowed time to find legal representation in the new year.

15 **Background**
16 I am the Respondent and the mother of Z and E. I am an American citizen, as are the children. I
17 moved abroad in 2014 at the behest of Dale Harvey, who was at the time my long-distance
18 boyfriend. Dale and I were married in 2015 and lived in multiple countries prior to the births of
19 Z and E. I obtained 2.5 year spousal visas in 2016 and 2019 that allowed me to live and work in
20 the UK. In 2021, I obtained Indefinite Leave to Remain in the UK as a victim of domestic
21 violence (EXHIBIT A-4).
22 On September 30, 2023 I fled the UK with Z and E. I fled because I had suffered from major
23 depressive disorder as a result of my abusive marriage for years (evidenced by psychological

DECLARATION OF GARANN R. MEANS
Page 3

assessments lodged by Petitioner) and could see no outcome to remaining in the UK other than suicide. I took my daughters with me because they had expressed a consistent and adamant wish to move to Seattle and, separately, because it is my duty as their mother to protect them.

Dale's abuse of me was mostly psychological. However, in April 2020, Dale abused Z. It was two days before a pediatrician could examine her, due to lockdown, and the nature of her injury could not be determined. The was no further investigation and no evidentiary trial on charges of child abuse, despite the certainty that something had happened and that Dale was the only person with Z when it happened. For years I invented alternate explanations to cope with knowing the girls were alone in Dale's care, but in August 2023 I had a personal experience which made me certain Dale had abused Z. Based on things the children have said, I also believe Dale has made and potentially shared indecent images of them. These concerns were also reported to authorities in Scotland, who took no action.

I attempted to escape abuse via the proper channels in Scotland. I sought a relocation, which was refused based on the perceptions of the Sheriff in the case. I appealed against the decision's bias, lack of factual basis, and circular logic and the appeal was refused.

In April 2023 the girls spent longer out of my care than they had before in their lives. During that time, I realized that without the purpose of caring for my children, I was at risk of suicide if I remained isolated in Scotland. I attempted to finish up my business in Scotland by filing for divorce from Dale and requesting new child custody orders that would be practicable with me living in Seattle. I applied to the Court of Session, believing that court to be less busy than the Glasgow Sheriff Court and thus faster. Dale filed an action in that lower court for no-fault divorce in response, and was able to have my action remitted to the lower court.

DECLARATION OF GARANN R. MEANS
Page 4

In July of 2023, when I knew I needed to get home very urgently, I asked Dale to mediate on care for the girls when I inevitably returned to Seattle (EXHIBIT A-5). He agreed, but purposefully delayed (EXHIBIT A-6). He continued to push for further litigation, and I felt certain that he was waiting for my mental health to be so impacted that I abandoned the girls, allowing him to set terms in all matters with the impunity he enjoyed before we moved out of his home.

In Scotland, fathers obtain rights to determine important aspects of a child's life from the moment they are born. Because mothers so frequently bear sole *de facto* responsibility for making sure a child has education, healthcare, a name, a moral framework, etc., most mothers in Scotland have technically violated that law. I organized and paid for all the children's nurseries and Z's first year of primary school, and the punishment for doing so was that I was barred from organizing further schooling. It is difficult, seemingly by design, for mothers in Scotland to build lives separate from abusive partners.

**Petition**

When we arrived in Seattle, I expected to be served with legal documents by federal marshals within about two weeks, based on anecdotes online. Dale and his solicitor, Karen Gailey, had indicated that he would seek to have the children returned under the Hague Convention. I knew the majority of Hague Convention cases involve domestic abuse (EXHIBIT A-7), so I assumed once local authorities or attorneys became involved, they would first check with the Address Confidentiality Program (hereafter "ACP") to confirm that I could be served that way (EXHIBIT A-8). I set up an ACP address with the help of my domestic abuse advocate so that

DECLARATION OF GARANN R. MEANS
Page 5

there would be no need for Dale to know our physical location. I was aware of the ACP from my time working for the Washington Secretary of State.

When we arrived in Seattle I explained my actions to Z and E. I had purchased return flights to Seattle, and at that point I gave them the option of using the tickets. I explained that, for the reasons of my likely imprisonment (outlined in Karen Gailey's declaration), I could not return to Scotland. The girls were vehemently opposed to returning to Scotland and their dad's sole care. That wasn't surprising, because it had been their position since even before we were first allowed to visit Seattle that this was where they wanted to be.

What surprised me was that the children have refused to speak to their dad. In Scotland, there were frequently handovers when one of the girls was refusing to go with Dale, and I had to chase them around our apartment building trying to persuade them, or allow them to be physically grabbed and carried away by Dale. E increasingly objected to going to nursery because she was afraid Dale would be picking her up. But neither the nursery or the primary school ever called me to say the girls' distress was continuing, and it was only a handful of times that I called the girls while they were with Dale and they appeared anxious to leave. I didn't know their relationship was already so bad.

When the girls have given Dale a chance, he's done nothing to repair their relationship. E agreed to call him on her birthday and rather than focus on her special day, he rushed to play her a manipulative recording where he was audible coaching her nursery friend to say how much she missed her and that she would see her soon. E hid from the telephone in my arms until I told her she could hang up. On November 11, I noted to the girls that they hadn't spoken to their dad in over a month, and they agreed to another call. On that call, Dale kept repeating that he would see

DECLARATION OF GARANN R. MEANS
Page 6

them soon, in a way I felt was menacing. He also said he was about to have some eggs to eat, when it was evening in Scotland.

Dale all but said he was in Seattle, which caused me to reach out to my family about extra security such as doorbell cams and to keep the children out of school temporarily. After that, the children have been unwilling to speak to him at all.

Dale has portrayed his absence from the girls' lives as an injury to them. He claims they are being denied access to him. The court cannot obtain an accurate picture of the facts without taking the children's views. Neither Dale nor I should be speaking on their behalf, when it is the girls who the court's decision will most impact. When I was a child my parents were divorced and I had very little input into what happened to me, which was extremely distressing. I strongly believe that the only thing worse than exposing children to adult disputes is exposing them to the consequences while suppressing their ability to object.

When I was not served with papers, I proceeded in building a life for the girls and myself in Seattle. I got them enrolled in school and registered with a primary care physician and dentist. I got them their COVID boosters. Z learned the pledge of allegiance and E began learning Spanish. The girls have been referred for mental health services to help them cope with the things they've had to cope with throughout their short lives. They've both received glowing half-year reviews (EXHIBITS A-9, A10). Z has gone from being a satisfactory student in Scotland to being in the most advanced cohorts of her American class. E has lost the desire to play hooky she had in Scotland. She's only had one serious cold here, compared with two a month in the UK, but when I kept her home she complained about missing her school. They've been able to take field trips with their new friends to see traditional Mexican dance, the butterflies at the Science Center, fire stations, and gingerbread houses. E celebrated her birthday at the waterslides and Z

DECLARATION OF GARANN R. MEANS
Page 7

had a party with classmates at the roller rink. For over two months, the girls have enjoyed a safe and happy life.

The only time the girls and I were "on the run" were the days we were actively fleeing the UK. We didn't come to Seattle because it was a good place to hide. We came here to survive, and because I believed this is where I could make the best home for us. Seattle has more than delivered.

Dale makes claims that I have inherent mental health problems not caused by his abuse. I am 45 years old. There have been times in life where I felt depressed, and even one incident where a documented side effect of smoking cessation medication (EXHIBIT A-11) made me believe I should kill myself by drinking half a bottle of wine quickly. The chronic depression he refers to only began during our relationship.

Dale accepts that I had severe mental health issues prior to leaving Scotland. His attorney, Karen Gailey, even goes so far as to suggest I will probably stab my children due to their severity, as evidenced by me preferring to live in the US to living in Scotland.

Upon arriving in the US I also registered myself with a primary care provider. Upon learning my history, she had me complete an inventory of anxiety and depression. It was only in doing so that I realized that I am no longer depressed. Unfortunately, my anxiety is now much higher due to Dale's pursuit, and I have been provisionally diagnosed with PTSD. I was told by my treating psychologist in Scotland and by Mary Keenan Ross, the psychologist who assessed me for court, that my depression would probably clear up if I returned with the girls to Seattle and my support network. It was impossible to believe at that time, when I couldn't even get out of bed if I wasn't caring for my children. But it has proven entirely accurate.

DECLARATION OF GARANN R. MEANS
Page 8

I accept that the abuse of my children was not investigated at the time it happened and cannot be judiciously dealt with this long after the fact. I believe there is a grave risk of harm to them in returning to Scotland to live alone with their dad, whether due to abuse, Dale's need to conceal abuse, or how little Dale values them as human beings. I accept that I know these things because of my familiarity with the people and events involved.

There is a provably grave risk of harm in the suicide of a young child's mother. Dale has knowingly been driving me toward desperation and suicide as a way to reestablish complete control over the girls and, through the girls, me. He and his mother, Alison Harvey, sat in the Glasgow courtroom during recess and openly laughed about what my "impatience" would drive me to. Where even many abusive parents would have made concessions for the well-being of the children and their need of their mother, he has been vicious and unrelenting.

The impact of Dale's abuse on my mental health is thoroughly documented and unmistakable. There is no evidence to support his claim that any severe, ongoing mental health issues predate our relationship. My mental health has worsened the longer I have spent trying and failing to get my children and I to safety. I tried everything suggested to me in order to cope and adjust. I studied martial arts, I joined a book club, I joined a gym, I went to the beach. My hopelessness for my children's future was bigger than any of it.

Z and E will suffer tremendous psychological harm whether I survive them being returned to Scotland or not. The path Dale has chosen of forcing them back to Scotland guarantees to add more Adverse Childhood Experiences to those they've already been exposed to (EXHIBIT A-12). Dale will not allow me to be part of their lives from afar. My next hope of seeing them will be when Z turns 16. They have said over and over that our life in Seattle is what they want. They

DECLARATION OF GARANN R. MEANS
Page 9

won't suffer only from the consequences of having their father's right to control them placed above theirs; they'll suffer whatever punishment he has planned for them defying him. Although Dale claims he is the victim of abuse, his actions over the past months reveal who he is. The State Department suggested he hire a private investigator to find my address for service (EXHIBIT A-13). Instead, Dale flew to Seattle and used our confidential address as justification to stalk us and harass my family. He claims he had to be here to take the children back to Scotland, but he knew the emergency protection orders he sought were unjustified and there was no reason the children should be returned before an evidentiary hearing. Dale came to the United States specifically to cause fear. He has amplified the threat by requesting compensation for his costs to stalk us.

Dale's allegations about me being violent toward the children are opportunistic and unfounded. Even prior to the protection order I received in King County, Dale didn't ask about their well-being. He knew they were safe and happy with me. For years he's amplified an incident where I clapped him on the shoulder to get his attention as a full-on assault with punching and kicking, but a lack of any physical evidence or police report. Similarly, he claimed that I isolated him from his family and friends while controlling what country I could live in and who I was allowed–and physically able to–see. Dale relies on playing the victim. He enjoys substantial material benefit as a result of our marriage while the girls and I receive public assistance, doing everything he can to prevent me and the girls accessing safety that would threaten the house of cards he's built on people's sympathy.

Although the Hague Convention exists to provide automatic return of children to their home jurisdiction, I know it allows for judicial discretion in supporting the best interests of the children involved. Z and E's best interests are already being served by being in Seattle. What they will

DECLARATION OF GARANN R. MEANS
Page 10

endure if they're returned to Scotland is unquestionably intolerable for such young children. In comparison, Dale loses nothing if his petition is rejected. He already knows the girls are safe and happy, which is all a parent can ask for.

I declare under penalty of perjury under the laws of the State of Washington that the facts I have provided on this form (and any attachments) are true. I have attached 38 pages under a separate document.

Signed at Seattle, Washington                                          Date: 18th December, 2023

s/ Garann Rose Means     ==

Garann Rose Means, Respondent

DECLARATION OF GARANN R. MEANS
Page 11