Honorable Jamal N. Whitehead

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| DALE HARVEY, | No. 2:23-cv-01712-JNW |
|---|---|
| Petitioner, | |
| vs. | RESPONDENT'S PRETRIAL STATEMENT |
| GARANN ROSE MEANS, | |
| Respondent. | |

Respondent Garann Rose Means hereby submits her pretrial statement pursuant to LFLCR 16(b)(2)(A).

**I.    ISSUES**

1. Grave risk of physical harm to the children;

2. Grave risk of psychological harm to the children;

3. Intolerable situation if the children are returned to Scotland;

4. Social Background in Scotland; and

5. Coercion used to establish children's habitual residence as Scotland.

**II.    FACTUAL BACKGROUND**

This case was brought by Petitioner Dale Harvey and seeks a return of the children Z and E under the Hague Convention on the Civil Aspects of International Child Abduction, done at the Hague on 25 Oct 1980 and 22 U.S.C. § 9001 et seq., the International Child Abduction Remedies Act (hereafter "ICARA").

The Respondent and the children fled Scotland on September 30, 2023 and established a home in Seattle, WA. At the time, the children were subjects of custody orders in Scotland which gave the Petitioner and Respondent equal parenting time. The Petitioner was exercising his custodial rights up until the 30th of September.

The Petitioner is restrained by a Protection Order in King County Superior Court from contacting or coming within 1,000 feet of the Respondent, or from obtaining firearms. The children were initially protected by the same order, but their protection was later removed on the court's own motion. Proceedings related to the Protection Order are ongoing, and being conducted with awareness of this present case.

Proceedings for divorce and modification of custody arrangements were ongoing in Scotland prior to the Respondent and children's departure, but those proceedings have been suspended pending conclusion of this present case.

### III. REQUEST FOR RELIEF

1. <u>Grave risk of physical harm</u>

    In April 2020, after being in the Petitioner's sole care, Z had around a teaspoon of blood in her underwear. There was no injury to explain the bleeding. The Respondent thought she saw a cut, but it was revealed to be a capillary in an examination by Z's pediatrician, which did not take place for two days due to COVID-19 lockdown

measures.

The Petitioner objected to the medical exam, and a follow-up appointment. He characterized it as "invasive". It is unclear how any examination of that nature could be less invasive. He declared that the bleeding was the result of a "straddle injury" caused by a fall from a toy piano bench. There was no evidence of any injury. The piano bench in question was less than 8" off the floor.

It was the Petitioner who indirectly made the Respondent aware of the bleeding. The Petitioner did not mention the blood; instead, he told the Respondent that "her vagina" "needs checked". In subsequent family court proceedings, the Petitioner swore that the blood was present and he had been alone with Z prior to noticing it.

When the source of the bleeding could not be found, Glasgow police and social work declined to investigate the matter any further. Despite the agreement that the blood was there and only the Petitioner was with Z when the bleeding would have occurred, the Petitioner was returned to lockdown with the children and the Respondent. Because there were no charges brought, there was no hearing on the incident. The Petitioner used a claim of "false allegations" as an attack on the Respondent's credibility in custody proceedings, and findings were made as part of those proceedings without further investigation into what had actually caused the bleeding. The Petitioner's explanation of a "straddle injury" was accepted as legal fact, despite being disproved by the medical evidence.

Z has no medical issues that would explain the incident. There was no recurrence of the bleeding before or after, to the Respondent's knowledge. One month after the incident, the Respondent moved out of the Petitioner's apartment, along with the

children. In July 2020, the Petitioner was awarded overnight custody of Z alone. The Petitioner lived alone, in lockdown, and there would have been no one to observe a recurrence of the bleeding.

There is no other reasonable explanation for the incident but that Z was abused by the Petitioner. There were later incidents where the children mimicked a sex act and told the Respondent their father had filmed them in the bath. These incidents took place in the gap between legal actions in Scotland, when the Petitioner was under reduced scrutiny.

The children are older and more able to understand body safety now than when the abuse happened, but E in particular is still at risk because she still requires help with the toilet. The children are articulate and able to recount events, but one of the things they've recounted is the Petitioner using medicine to knock them out when they weren't actually ill.

There is no direct evidence that the physical abuse took place, but there is evidence that the Petitioner attempted to prevent investigation of it, and the only alternative explanation proposed is disproved. Unsupervised time with the Petitioner, particularly once the children no longer have the Respondent's protection, must be viewed as a risk to their safety.

2. <u>Grave risk of psychological harm</u>

The Petitioner's position is that the Respondent fled to Seattle to "forum shop." This is inaccurate. The Respondent came to Seattle to save her life. The Respondent took the children with her because of the grave risk of physical harm mentioned already, in addition to their emotional dependence on her.

Assessments by psychologist Mark Keenan Ross and by the British Home Office

RESPONDENT'S PRETRIAL STATEMENT- 4

support the Respondent's assertion that she suffered domestic abuse at the hands of the Petitioner. Specifically, the Respondent suffered coercive control which undermined her identity and her independence to the extent that even when she identified that she had to get home to the support of her family to give the children a safe home, she continued to believe she could not do so without the Petitioner's participation, because she had accepted his abusive characterizations of her.

The Petitioner claims the Respondent abused him. This is false. Counter-accusations of abuse by abusers are common, especially in cases where no one witnessed the abuse that in fact took place.

The Petitioner claims the Respondent always suffered from severe mental health problems. This is false. The Respondent's current mental health problems began with the Petitioner's abuse. They were worsened not only by the realization that, although she was able to physically move out of the Petitioner's home, she continued to be isolated in a foreign country she would not be able to leave until her children were adults, but also by cruel and punitive treatment from the Scottish authorities.

Over years of litigating to get herself and the children to safety, the Respondent developed major depressive disorder. The depression led her to lose her job. The loss of the job led her to lose her access to mental health treatment, which had been through employer-provided private insurance.

In April 2023 the Petitioner failed to return the children as ordered by the court. The Respondent attempted to have him found in contempt of court. The Glasgow Sheriff Court, which had been so severe in its punishment for the Respondent's "mischief" such as keeping the children home when they were throwing up or registering them for school,

did not even acknowledge the motion. Up until that point the Respondent tried to focus on building a life in Scotland, but she lost faith that was possible. The Petitioner had repeatedly tried to prevent the Respondent and children returning to visit family in Seattle, and had become bolder with his apparent abuse. The Respondent went back to the courts to ask for a divorce and new custody orders which would be practicable with her living in Seattle.

The Petitioner successfully had the divorce case remitted from the Court of Session to the busier, slower Glasgow Sheriff Court. The Respondent proposed mediation to resolve the issues more quickly. The Petitioner agreed on paper, but caused further delays. The Petitioner knew the Respondent's mental health was dire. He knew she was desperate to get home and begin rebuilding her life. He attempted to force her into a position where he could set terms regarding the Respondent's access to the children with impunity, regaining total control. While the children were spending three weeks with the Petitioner, the Respondent became suicidal. She decided that any course of action was better than killing herself, but flight was the only one still open to her.

The Respondent cannot return to Scotland. The same conditions would exist, only worse. The Petitioner has made it plain he will seek imprisonment as a punishment for the Respondent's violation of the Scottish custody orders. The Respondent no longer has a home in Glasgow and no employment history which would convince a landlord to rent to her in a very competitive rental market. Waitlists for social housing are years long. Because of her status as an immigrant, the Respondent has no ownership of the Petitioner's apartment, which she provided the majority of funds to purchase. When the Respondent got out of jail, she would be homeless. She would certainly lose her custody

RESPONDENT'S PRETRIAL STATEMENT- 6

rights. She would be returning to Scotland to be punished ruthlessly by her abuser, without any ability to protect her children from him, or even to be a regular part of their lives. She would not survive.

In any scenario where the children are returned to Scotland, they will lose their mother. The Respondent has been the children's primary carer since birth. They are deeply attached to her. Scots law accepts the premise that children are harmed by not having their father in their lives, but the children have flourished in the almost four months during which they haven't seen the Petitioner. The same would not be true if roles were reversed and the children had spent as long away from their mother, to say nothing of the damage if they could never see her again.

The Petitioner is not harmed by being away from the children, either. He has even used his trips to the United States with the excuse of these proceedings not only to stalk the Respondent and children, but to further his hobby of concert photography. He has shown concern only for re-establishing control.

Returning the children to Scotland would result in one or two additional Adverse Childhood Experiences, adding to the three the Petitioner is already responsible for. More immediately, the children are terrified of the Petitioner. His misused contact with them since they fled to Seattle and his stalking of them has revealed his character. The Petitioner accuses the Respondent of manipulating the children, but–even if parental alienation weren't a broadly discredited defense–the Petitioner has done all the damage to their relationships entirely on his own. The act of returning the children itself would be traumatic for them.

If returned to Scotland, the children would experience the same things that led the

Respondent to become suicidal and try to escape. They would be isolated, with only the Petitioner in their daily lives. They would have no protection from him, in a culture that exalts the role of fathers to the point of willful ignorance of the danger they sometimes present. When the Petitioner was displeased with the children, they would face days of silent treatment, or worse. They would be trapped with an abuser. They would lose their mother. The damage to them would be devastating.

3. <u>Intolerable situation</u>

The Petitioner is either delusional or finds it necessary to pretend to others that he is the children's primary carer and their relationship is excellent. Whichever it is, he will not accept the children's defiance in refusing to return to him voluntarily. Even though he has spoken to the children and seen school reports that confirm they are doing very well without him, it continues to be his position that they are suffering and being denied access to him. If returned to Scotland, the children will be punished and there will be no one to stop it.

The Petitioner has offered no ameliorative measures, but even if he did offer regular communication with the Respondent, there would be no penalty for him failing to follow through. The possibility of ameliorative measures does not negate a grave risk to children in Hague Convention cases. The Petitioner would have the ability to remove the Respondent from the children's lives, making them entirely dependent on his good mood for their safety. The Petitioner accuses the Respondent of making false allegations against him and manipulating the children against him. He would not allow them access to their mother, or anyone who could get close enough to provide similar scrutiny.

The same realities that create a grave risk of physical and psychological harm will

create an intolerable situation for the children in the long term. The injuries to them will not be isolated incidents, but the fabric of their lives.

4. Social Background

Scottish culture values father's rights above the welfare of children. Although Scottish legislation requires that domestic abuse of a parent be treated as abuse of a child, family courts routinely ignore domestic abuse. It is accepted that mothers often make false allegations of abuse against fathers for no reason other than spite. There is little appetite to question why so many women would choose the difficulty of single parenthood over having help and involvement from a loving father, even if they don't personally like him, if they were not forced to prefer doing everything alone to endangering their children.

The Petitioner has presented evidence from institutions the children would have to turn to for help if they suffered further abuse after being returned to Scotland. Social workers have accepted that blood in Z's underwear was somehow the result of the Respondent's mental health. Z's school says there have been no issues with handovers. The children's nursery says the children have always been happy to come to nursery. These statements are untrue. These institutions can't be relied upon to provide safety when it might mean potential embarrassment or loss of funding.

The children have been abused by the Petitioner. If returned to Scotland, they will lose their mother. Other parties with responsibility for their welfare have put the Petitioner's interests above the children's safety, and been willing to lie about it to a foreign court.

5. Children's habitual residence

RESPONDENT'S PRETRIAL STATEMENT- 9

The children were born in Scotland, lived in Scotland prior to October 2023, and also attended school and nursery there. However, they only came to be born in–and then remain in–Scotland as a result of coercion by the Petitioner. The parties did not agree to raise the children there. The Respondent began expressing her wish to leave even before Z's birth.

The Respondent planned for Z to be born in Brighton, England, where the parties were living. The Petitioner insisted she must be born in Scotland. The Respondent was not allowed to see the apartment she paid the majority to purchase before moving to Glasgow. When the Respondent's maternity leave ended, she asked the Petitioner to allow the family to return to Brighton so she could go back to work. The Petitioner refused.

The Respondent began to ask more forcefully to leave Scotland once falling pregnant with E. Incorrectly blaming Glasgow for the Petitioner's abuse, she initially proposed a move to France, but the Petitioner's escalating behavior made her recognize that she and the children would not be safe isolated with him in a different country, either. She asked to return to Seattle and the support of her family, at which point the Petitioner told her that she could leave but would never see Z again. The Petitioner used the threat of the Hague Convention to keep the Respondent in Scotland and force E to be born there as well.

The Respondent's father had a cancer scare at the end of 2019, and the Respondent renewed her campaign to move the family home. The Petitioner told her she could go to visit if her father were dying. The Respondent filed a petition for relocation in February, 2020. Z was two years old and E was four months.

RESPONDENT'S PRETRIAL STATEMENT- 10

The Respondent was required to sign undertakings agreeing that Scotland was the children's habitual residence in order to visit her family in the United States. Had she not signed the undertakings, she would not have been allowed to see her family. The children would not have met most of their family. The Respondent had no choice.

The children were only habitually resident in Scotland as a result of the Petitioner using them to trap the Respondent there. They were infants prior to the COVID-19 pandemic, with no independent connection to Glasgow or Scotland. During successive lockdowns, they had no interaction with their communities. They were prohibited from traveling outside their local area. They spent the majority of the time alone with a primary caregiver who was American, receiving care packages from American family of things bought at American stores, cooking American recipes and watching American programs like Sesame Street for escapism. Even as two- and four-year olds attending nursery, they had limited awareness of being in Scotland. Most of what they understood was in the context of being not in Seattle, away from their family. Their habitual residence was with their primary caregiver. The geography was not a factor.

RESPONDENT'S PRETRIAL STATEMENT- 11

The Respondent respectfully requests the Court make a final decision consistent with the requests set forth above.

Respectfully submitted this 22nd day of January, 2024.

_____

Garann Rose Means, Respondent

RESPONDENT'S PRETRIAL STATEMENT- 12