Honorable Jamal N. Whitehead

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| IN RE APPLICATION OF DALE HARVEY,<br><br>Petitioner,<br><br>vs.<br><br>GARANN ROSE MEANS,<br><br>Respondent. | No.   2:23-cv-1712<br><br>FINDINGS OF FACT and<br>CONCLUSIONS OF LAW |

## I. Findings of Fact

1. The Respondent removed the children from Scotland on September 30, 2023, to protect them from a grave risk of physical or psychological harm by the Petitioner if they remained in the Petitioner's sole care in Scotland.

2. The children have been safe and happy in Seattle, and have shown no evidence of harm or distress stemming from their removal from Scotland.

3. The Petitioner forced the Respondent to move to and remain in Scotland through control of her immigration status and via threats to take her children from her.

4. The children were born in Scotland and lived there until September 2023 only due

to coercion by the Petitioner.

5. Claims of domestic abuse to the Respondent or of sexual abuse of the children were not investigated by law enforcement in Glasgow. There have been no hearings on the evidence and no determinations of whether the Petitioner is guilty of criminal acts.

6. Findings of fact regarding claims of abuse were made in the course of child custody proceedings where the Respondent's case would have been prejudiced by extensive focus on the abuse. Abuse was raised as an issue of credibility.

7. The Petitioner controlled and isolated the Respondent. His abuse is consistent with the definition of coercive control. His behavior toward the Respondent was illegal in Scotland.

8. The Respondent's mental health was compromised by the Petitioner's abuse and by her inability to leave him or to access the support of her friends and family in Seattle without abandoning her children.

9. The Petitioner intentionally damaged the Respondent's mental health. When the Respondent raised allegations of child abuse against the Petitioner, he exaggerated her difficulties and used her mental health to impeach her credibility.

10. The Petitioner sexually abused the oldest child, Z. He used lockdown, gaslighting of the Respondent, and feigned concern for Z's privacy to frustrate further investigation of the incident.

11. The Petitioner filmed the children in the bath. The Petitioner misused medication to knock the children out at night. The Petitioner has had long periods of unsupervised access to the children. The Petitioner's abuse was not confined to

one child or one incident.

12. The Respondent could not survive returning to Scotland. The result would be her suicide.

13. If the children are returned to Scotland, they forcibly have their mother and primary carer taken from them. The Respondent will have her parental rights removed and the Petitioner will not allow the children a relationship with her.

14. Returning the children to Scotland punishes them by taking their mother from them. At 4 and 6, they will not understand why they are being punished.

15. The Petitioner has used the pretext of needing to serve the Respondent with papers to come to Seattle and engage in blatant criminal stalking and harassment. The Petitioner is not able to legally serve the Respondent papers.

16. The Petitioner spent over a month stalking the Respondent and children in Seattle. The Petitioner still attests that he does not know their location. The Petitioner did not come to Seattle to accomplish a genuine goal apart from terrorizing the Respondent and children, and their family.

17. The children briefly had a Protection Order from King County Superior Court against the Petitioner. Because of the safety issues raised by his actions, they were made aware of his behavior.

18. The children understand why they are in Seattle. They have chosen to remain here. They have chosen not to have contact with the Petitioner.

19. The children view return to Scotland as a threat. The Respondent has acted entirely appropriately in protecting her children from a legitimate threat.

20. Forcible return of the children to Scotland will be deeply traumatizing to them. It

will not protect the children from harm. It will cause additional harm.

21. If the children are returned to Scotland, they will be returned to an intolerable situation. There will be no scrutiny on the Petitioner and no one to protect the children from him.

22. Institutions in Glasgow which should have raised questions about the children's safety with the Petitioner did not do so during child custody proceedings. The children have no independent advocates for their safety in Glasgow.

23. Contrary to the Hague Convention's aim of preventing harm, returning the children to Glasgow and the Petitioner's sole care would be the most harmful of all possible scenarios.

## II. Conclusions of Law

1. The Hague Convention requires a child be returned to their habitual residence if the petitioning party had custody rights and was exercising them at the time of removal. However, it provides an exception to return in Article 13(b):

    > "there is a grave risk that his or her return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation"

    The standard for grave risk of harm is high, but it has been clarified to include many types of harm. In *Golan v. Saada*, 596 U.S., 142 S. Ct. 1880 (2022), the Supreme Court found that abuse of a parent also constituted a grave risk to a child.

2. Domestic abuse in Scotland is defined by the Domestic Abuse (Scotland) Act 2018, Section 2:

"What constitutes abusive behaviour

(1) Subsections (2) to (4) elaborate on section 1(1) as to A's behaviour.

(2) Behaviour which is abusive of B includes (in particular)—

    (a) behaviour directed at B that is violent, threatening or intimidating,

    (b) behaviour directed at B, at a child of B or at another person that either—

    (i) has as its purpose (or among its purposes) one or more of the relevant effects set out in subsection (3), or

    (ii) would be considered by a reasonable person to be likely to have one or more of the relevant effects set out in subsection (3).

(3) The relevant effects are of—

    (a) making B dependent on, or subordinate to, A,

    (b) isolating B from friends, relatives or other sources of support,

    (c) controlling, regulating or monitoring B's day-to-day activities,

    (d) depriving B of, or restricting B's, freedom of action,

    (e) frightening, humiliating, degrading or punishing B.

(4) In subsection (2)—

    (a) in paragraph (a), the reference to violent behaviour includes sexual violence as well as physical violence,

    (b) in paragraph (b), the reference to a child is to a person who is under 18 years of age."

The Petitioner certainly isolated the Respondent and monitored her through her email. Other effects are more open to interpretation, but the Petitioner's behavior is plainly abuse under Scottish law.

3. In Washington State law, RCW 10.99.020 adds stalking as a specific domestic violence offense. The Petitioner engaged in stalking under the pretext of meeting his obligations to secure the return of the children in this case. Under Washington State law, his behavior is also abuse.

4. The grave risk alleged by the Respondent has not been closely examined by any other court. The Scottish court heard incidental evidence relating to abuse, which was assessed through the lens of custody proceedings. Had the Scottish court found that abuse occurred, its discretion would have been limited. King County Superior Court has not made a permanent determination. This court recognizes the custody orders made in Scotland but does not adopt the specific findings, which are largely not relevant in a Hague Convention case.

5. Although the Hague Convention prioritizes prompt return, the Respondent must be given the opportunity to defend her actions. In Velez v. Mitsak, 89 S.W.3d 73, 84 (Tex. App. 2002) the court remarked:

    "It was surely not contemplated by the drafters of the Convention that the provision requiring contracting states to use the most expeditious procedures available to implement the objectives of the Convention would override a party's right to present evidence on possible defenses."

6. In the interest of expediency, the Respondent's ability to gather corroborating evidence was limited. In *Silva v. Dos Santos*, 68 F. 4th 1247 - (Court of Appeals,

11th Circuit 2023), the court found that the clear and convincing evidence standard necessary to meet the burden of Article 13(b) can be met by testimony alone:

> "So even though the district court expressly found that Silva's testimony was not credible and did not make a similar finding as to dos Santos, it concluded that dos Santos did not meet her burden to establish the harm Y.F.G. faced in Brazil.
>
> We believe this reasoning reflects two legal errors. Cf. Walsh v. Walsh, 221 F.3d 204, 218 (1st Cir. 2000) (correcting district court's legal analysis after district court "raised the article 13(b) bar higher than the Convention requires"). First, given that Silva testified about the alleged abuse and the district court expressly did not believe him, under our precedent, it's not necessarily the case that dos Santos's testimony was uncorroborated. And second, even without independent corroboration, a factfinder's belief in a single witness's testimony alone can be sufficient to satisfy a party's burden to prove a fact by clear and convincing evidence."

The Respondent's testimony can be corroborated by the testimony of other witnesses and their credibility, and said to meet the standard for proving grave risk of harm.

7. The Respondent spent the entirety of the children's lives in Scotland attempting to relocate away from Scotland. Their residence in Scotland was only due to coercion by the Petitioner. In *Morales v. Sarmiento*, (Dist. Court, SD Texas 2023),

it is explained how coercion can impact habitual residence:

> "Domestic violence and coercion can undermine shared intent to settle in a country. See id. ("[S]uppose, for instance, that an infant lived in a country only because a caregiving parent has been coerced into remaining there. Those circumstances should figure in the calculus."); Silverman v. Silverman, 338 F.3d 886, 900 (8th Cir. 2003) ("Habitual residence is not established when the removing spouse is coerced involuntarily to move to or remain in another country."); Tsarbopoulos v. Tsarbopoulos, 176 F. Supp. 2d 1045, 1056 (E.D. Wash. 2001) ("The verbal and physical abuse of one spouse by the other is one of several factors in the Court's determination of the existence of `shared intent' to make a place the family's `habitual residence.'")."

The children cannot be said to have been truly habitually resident in Scotland.