UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| DALE HARVEY,<br><br>    Petitioner,<br><br>  v.<br><br>GARANN ROSE MEANS,<br><br>    Respondent. | CASE NO. 2:23-cv-1712<br><br>ORDER GRANTING PETITION FOR RETURN |

This matter comes before the Court on Petitioner Dale Harvey's petition for return of his children, Z.H.M. and E.H.M., under the Hague Convention on the Civil Aspects of Child Abduction and the International Child Abduction Remedies Act, 22 U.S.C. §§ 9001-9011 ("ICARA"). Dkt. No. 1. The Court held an evidentiary hearing on the merits of the petition on January 26, 2024. Harvey appeared through counsel, Marguerite Smith. Respondent Garann Rose Means was also present, representing herself pro se. Having considered the arguments advanced by the parties, examined the evidence, and reviewed the record, the Court GRANTS the Petition and ORDERS return of Z.H.M. and E.H.M. to Scotland for the reasons discussed below.

ORDER GRANTING PETITION FOR RETURN - 1

# 1. FINDINGS OF FACT

**1.1.** Means and Harvey are the parents of two young children: Z.H.M. and E.H.M., now ages six and four.

1.2. Harvey is a citizen of Scotland and Means is a United States citizen, born and raised in Washington state. Her parents and extended family continue to reside in the Seattle area.

1.3. Means and Harvey married on April 12, 2015, in Seattle, Washington. From the early days of their marriage, Harvey and Means experienced troubles in their relationship.

1.4. In 2017, Harvey and Means moved from Brighton, England to Glasgow, Scotland and purchased a flat.

1.5. Later that year, their eldest daughter was born. Their youngest daughter was born two years later in 2019. Means and Harvey love their children, and both wish to play an active role in their upbringing. They split primary caretaking responsibility evenly.

1.6. Until the events giving rise to the Petition, the children resided at all times in Glasgow, Scotland, where they attended daycare and nursery.

1.7. During 2019, Means began expressing her desire to relocate to the U.S. to be closer to her family and friends. Harvey objected to resettling in another country.

1.8. In February 2020, Means initiated custody proceedings in Scotland, seeking to relocate the children to Washington. Harvey opposed the request, but

due to COVID-19 lockdowns, the Scottish court delayed a contested hearing on the matter.

1.9.  In April 2020, during the custody proceedings, Means accused Harvey of sexually abusing Z.H.M. The allegations stem from when Harvey was watching Z.H.M., and he noticed blood spotting in Z.H.M.'s underwear. Harvey told Means about the blood he found and said that Z.H.M. should be checked.

1.10.  On April 7, 2020, Means contacted the National Society for the Prevention of Cruelty to Children (NSPCC).

1.11.  After receiving a referral from NSPCC, a Duty Social Worker, Scott Andrew McCabe, as well as Child Protection officers visited Harvey and Means's home on April 8, 2020.

1.12.  On April 9, 2020, a consultant pediatrician conducted a medical examination of Z.H.M. The pediatrician told McCabe there were no internal or external injuries and no signs of abuse. Means does not contest the pediatrician's findings and concedes there is no physical evidence of sexual abuse. Means does not allege other occurrences of sexual abuse after or before April 2020.

1.13.  A couple of weeks later, Means walked in Z.H.M.'s bedroom to find her with Harvey not wearing pants or underwear. Means saw Harvey put something in his pocket and he said, "the last time you accused me of being a pedophile, you said you needed therapy."

1.14.  Harvey and Means's relationship continued to deteriorate and they officially separated.

1.15. In 2021, Z.H.M. told Means that she had taken a bath with Harvey. According to Harvey, this did not happen. It would have been logistically impossible given the size of their bath.

1.16. Means visited Seattle with the children from late-October to early-November 2021, before returning to Scotland.

1.17. On August 12, 2022, Sheriff Charles Lugton issued a judgment in which he denied Means permission to relocate with the children to Washington and awarded each parent 50 percent custody. He found Means made false sexual abuse allegations against Harvey. The judgment was later modified to prevent Means from removing the children from their current school and nursey and enrolling them elsewhere without Harvey's permission.

1.18. Means filed for divorce on April 28, 2023.

1.19. Means has depressive and anxiety disorder. She states she experienced mental health issues because Harvey refused to allow her and the children to relocate to the United States despite her isolation from her community and support network of family and friends in Seattle.

1.20. Means felt emotionally abused by Harvey during their marriage. Harvey undermined her parenting decisions. She also felt she had to walk on eggshells to avoid arguments and Harvey getting angry. Means does not allege that this abuse occurred in front of their children. Nor does she allege that Harvey emotionally abused their children.

1.21. Means appealed Sheriff Lugton's judgment, but the Scottish courts affirmed the decision.

ORDER GRANTING PETITION FOR RETURN - 4

1.22. In fall 2023, Means felt her only options were suicide or moving to Washington to be close to her friends and family.

1.23. On September 30, 2023, Means left Scotland with the children and moved to Seattle, Washington.

1.24. Pursuant to their parenting agreement, Harvey was prepared to pick up the children from Means's care on October 4, 2023. That morning he received an email from Means telling him she had left the country with the children.

1.25. In her email, Means tells Harvey he can either "provide interim consent for [Means and the children] to stay" in the U.S. or she will "put [him] on blast." Dkt. No. 2-18 at 2 (Exhibit 21).

1.26. At the time Means left with the children, Harvey was exercising his custodial rights.

1.27. Harvey filed Requests for Return for Z.H.M. and E.H.M. on October 4, 2023, with the American and Scottish Central Authorities. Dkt. Nos. 4-1, 4-4.

1.28. On November 8, 2023, Harvey filed a Petition for Return with this Court as well as a motion seeking an ex parte temporary restraining order transferring the children to his custody.

1.29. Means petitioned the King County Superior Court for an ex parte temporary protection order against Harvey, which it entered on November 22, 2023.

1.30. In her sworn petition, Means states that after her trip to Seattle with the children, she became "suicidal" when the children were with Harvey and she "knew [she] had to go home." She left Scotland with the children to return to Seattle, knowing that doing so breached the Scottish custody order. She states that

ORDER GRANTING PETITION FOR RETURN - 5

if the children are forced to return to Scotland, "this holiday season will be the only one they ever spend in the US with their family and the last one they spend with me until adulthood." She does not allege in the petition that the children will face abuse, sexual or otherwise, if they are returned to Scotland.

## 2. CONCLUSIONS OF LAW

The goal of the Hague Convention and ICARA is "to secure the prompt return of children wrongfully removed to or retained . . . [and] to ensure that rights of custody and of access under the law of one Contracting State are effectively respected in other Contracting States." Hague Convention, art. 1. Because the primary remedy under the Convention and ICARA is the return of wrongfully removed children, the Court's role does not involve making affirmative custody determinations. *Monasky v. Taglieri*, 140 S. Ct. 719, 723 (2020) ("It is the Convention's core premise that the interests of children in matters relating to their custody are best served when custody decisions are made in the child's country of habitual residence.") (cleaned up); *Cuellar v. Joyce*, 596 F.3d 505, 508 (9th Cir. 2010) ("With a few narrow exceptions, the court must return the abducted child to [their] country of habitual residence so that the courts of *that* country can determine custody.") (emphasis in original).

Both the United States and the United Kingdom, including Scotland, are signatories to the Convention. U.S. Department of State, Bureau of Consular Affairs, Hague Abduction Convention Country List, https://travel.state.gov/content/

ORDER GRANTING PETITION FOR RETURN - 6

travel/en/International-Parental-Child-Abduction/abductions/hague-abduction-country-list.html (last visited January 25, 2024).

**2.1   Harvey established a prima facie case for return of the children.**

"To establish a prima facie case for the return of a child, Petitioner must demonstrate by a preponderance of the evidence that: (1) the child at issue is under the age of sixteen; (2) the child had a "habitual residence" in a foreign country that is a signatory to the Convention; (3) the child was removed or retained in breach of the petitioner's custody rights under the law of the country of habitual residence; and (4) the petitioner was exercising those rights at the time of the child's wrongful removal or retention." *Rivera Gabriel v. Lavison*, No. 2:22-CV-00006-TL, 2022 WL 952195, at *4 (W.D. Wash. Mar. 30, 2022) (citing 22 U.S.C. § 9003).

> **2.1.1   Means concedes the first, third, and fourth elements of Harvey's prima facie case.**

The children are six- and four-years old, so the first element is easily met.

Means concedes the third element: the children were subject to a custody order by the Scottish court that gave her and Harvey equal parenting time and that prevented her from removing them from their current school and nursery, but she took the children to the United States anyway. Harvey presented evidence of his custody rights under Scottish law, including a declaration by Scottish solicitor, Karen Gailey, and the Judgment of Sheriff Charles Lugton dated August 12, 2022. Dkt. Nos. 2 at 1-25; 72-5 at 2-54. Gailey explained that, as a married father, Harvey has equal parent al rights and responsibilities under the Children (Scotland) Act 1995. Dkt. No. 2 at 4-5. When a dispute arises between two parents, the Scottish

court can order alternate custody[1] arrangements under section 11 of the 1995 Act. The August 12, 2022, judgment by Sheriff Lugton concluded:

> [I]t is not in the children's best interest that a specific order be made under section 11(2)(c) of the Children (Scotland) Act 1995 . . . to allow [Means] to relocate the children to Washington State, U.S.A." and "it is in the children's best interests that a joint residence order be made under section 11(c)(ii) of the 1995 Act . . . whereby the children will reside with [Harvey] on a fortnightly basis, in week one from Wednesday at 8am until Monday at 8am, and in week two from Wednesday at 8am until Friday at 8am; and with [Means] at all other times.

Dkt. No. 72-5 at 7. Although Sheriff Lugton granted Means "four consecutive weeks each year" for travel to the United States, he specifically denied relocation. *See id.*

Accordingly, the Court finds that Harvey has shown, by a preponderance of evidence, that Means wrongfully removed the children by taking them to the United States in violation of the joint custody arrangement set forth by the Scottish court.

Means also concedes the fourth element, acknowledging that Harvey exercised his custodial rights up until her departure with the children on September 30, 2023. Harvey testified that the children regularly stayed with him in accordance with their split custody arrangement. The record reflects that he was prepared to pick up the children from school, only to receive an email from Means on October 4, 2023, informing him that she had taken the children to the U.S. Harvey filed a Request for Return with the Scottish and American Central Authorities soon after. Harvey was clearly exercising his parental rights.

---

[1] Gailey notes that the 1995 Act no longer uses the specific terms "custody" or "access."

ORDER GRANTING PETITION FOR RETURN - 8

### 2.1.2 The children habitually resided in Scotland before Means took them to the U.S. Thus, Harvey also establishes the second element of his prima facie case.

The Convention intentionally leaves the term "habitual residence" undefined. *Holder v. Holder*, 392 F.3d 1009, 1015 (9th Cir. 2004). The Supreme Court provides "[t]he place where a child is at home, at the time of removal or retention, ranks as the child's habitual residence." *Monasky*, 140 S.Ct. at 729. The Court's inquiry into habitual residence is, therefore, highly fact-intensive and no single fact is determinative across all cases. *Id.* at 727. The Supreme Court also states "[w]here a child has lived in one place with [their] family indefinitely, that place is likely to be [their] habitual residence" unless "an infant lived in a country only because a caregiving parent had been coerced into remaining there." *Id.*

It is uncontested that both children were born in Scotland and resided there exclusively until Means took them to the U.S. on September 30, 2023. At the hearing, Means argued that the children were born and remained in Scotland because of Harvey's coercion.

Means testified that she was unhappy in Glasgow and wanted to continue living in Brighton rather than move before Z.H.M.'s birth. Means also testified that she felt dependent on Harvey for her continued immigration status. Harvey testified he never threatened to revoke Means's immigration status, and Means does not dispute this testimony. Harvey also offers text messages in which Means expresses excitement about visiting Glasgow and later her "support and trust" in Harvey to select a home in Glasgow for their growing family. Exhibit 74.

It is undisputed that Means did not raise coercion as an issue in the Scottish court relocation proceedings. Quite the opposite, as she submitted several documents to the Scottish court affirming Scotland as the children's habitual residence, including her Initial Writ (Exhibit 66) and Undertaking signed in September 2021 (Exhibit 22). Given this record, the Court finds that Means's claims about coercion lack credibility.

Even if the Court accepts Means's testimony as true, it fails to rise to the level of coercion because nothing suggests Means did not voluntarily move to and remain in Scotland with Harvey for the birth of their children. *See Tsuruta v. Tsuruta*, 76 F.4th 1107, 1110-11 (8th Cir. 2023) (affirming a district court decision that "concluded the lack of physical abuse, violence, or threats of violence as well as limited evidence of control distinguished this case from other instances where coercion impacted the habitual residence determination."). Moreover, coercion cannot be established simply because Harvey did not agree to allowing Means to relocate to the United States with their children. *See Silverman v. Silverman*, 338 F.3d 886, 900 (8th Cir. 2003) (finding a respondent's "subsequent, post-move desire to return to the United States, . . . d[id] not change the legal conclusion that the habitual residence of the children changed[.]").

Means grew to dislike Glasgow as her marriage and mental health worsened, but a change of heart cannot override the clear conclusion that Scotland is the children's habitual residence.

Thus, the only remaining question is whether Means can establish an affirmative defense to wrongful removal under the Convention.

ORDER GRANTING PETITION FOR RETURN - 10

**2.2   Means fails to establish the children will be at risk of grave danger if returned to Scotland.**

Once a petitioning parent establishes a prima facie case, the Court must order prompt return of the children "unless one of the narrow exceptions set forth in the Convention applies." 22 U.S.C. § 9001(a)(4).

Under Article 13(b) of the Convention, there is an exception to mandatory return if the respondent establishes by *clear and convincing* evidence that "there is a grave risk that . . . return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation." *Monasky*, 140 S. Ct. at 729 (citing Hague Convention, art. 13(b), Treaty Doc., at 10); 22 U.S.C. § 9003(e)(2)(A); *see Colorado v. New Mexico,* 467 U.S. 310, 316 (1984) (clear and convincing evidence places in the "factfinder an abiding conviction that the truth of its factual contentions are 'highly probable.'") (citation omitted). The harm must be "something greater than would normally be expected on taking a child away from one parent and passing the child to another." *Nunez-Escudero v. Tice-Menley*, 58 F.3d 374, 377 (8th Cir. 1995) (internal quotation marks omitted).

Means identifies three types of dangers if the children are returned to Scotland.

**2.2.1   Separation from Means cannot suffice as a grave danger.**

Means testified that the children will suffer harm if returned to Scotland because they will effectively lose their mother. She claims she cannot return to Scotland because she felt suicidal there and when in Washington, she no longer experiences suicidal ideations. Means offers her medical records to argue this point.

ORDER GRANTING PETITION FOR RETURN - 11

She also testified she will be unable to find employment or housing in Scotland and she could be subject to criminal prosecution for taking the children away in violation of the Scottish court order.

Separating a parent from their child is undoubtedly traumatic for both parties, so the Court does not wish to downplay this concern. But standing alone, the possible loss of access by a parent to the child—and vice versa—does not constitute a grave risk of harm per se under Article 13(b). *Souratgar v. Lee*, 720 F.3d 96, 106 (2d Cir. 2013); *see also Charalambous v. Charalambous*, 627 F.3d 462, 469 (1st Cir. 2010) ("[T]he impact of any loss of contact with the [parent] is something that must be resolved by the courts of the Children's habitual residence.") (quoting *Charalambous v. Charalambous*, No. 2:10-CV-375, 2010 WL 4115495, at *12 (D. Me. Oct. 12, 2010)).

The Court finds no unique harm posed by separating the children from Means beyond that "expected on taking a child away from one parent and passing the child to another." *See Nunez-Escudero*, 58 F.3d at 377. As one Court observed, "[i]f the difficulty caused by such separation were deemed sufficient to satisfy the grave risk exception, the purposes of the Convention would be largely frustrated." *Aguilera v. De Lara*, No. CV14-1209 PHX DGC, 2014 WL 3427548, at *5 (D. Ariz. July 15, 2014). In truth, "[u]nder the logic of the Convention, it is the *abduction* that causes the pangs of subsequent return." *Friedrich v. Friedrich*, 78 F.3d 1060, 1068 (6th Cir. 1996).

### 2.2.2 Alleged abuse suffered by Means does not establish a grave danger to the children.

Means also testified Harvey emotionally abused her during their marriage by surveilling her email account, physically blocking the door when she tried to take one of her daughters to lunch one time, and threatening to leave her. *See* Exhibit A-27. She also argues that a pet died once under mysterious circumstances. Means offers her medical records and testimony to support her claims. Exhibits A-30, A-31. Harvey responds that Means pushed and slapped him one occasion and offers an email in which she apologized for "attacking" Harvey. Exhibit 57 at 157.

"A respondent parent can establish a grave risk of harm from abuse where the petitioning parent has actually abused, threatened to abuse, or inspired fear in the children in question[.]" *Colchester v. Lazaro*, 16 F.4th 712, 718 (9th Cir. 2021) (internal citations omitted). A grave risk to the respondent parent, however, does not automatically qualify as grave risk to the children. *See Charalambous*, 627 F.3d at 468 (finding that the respondent parent "failed to draw a connection establishing, by clear and convincing evidence, that any risk to her constituted a grave risk to the children" even though she had endured some verbal and emotional abuse as well as one incident of physical abuse given that the children did not witness it). Courts may find a grave risk of harm if a respondent demonstrates "[s]pousal violence . . . particularly when it occurs in the presence of the child." *Colchester*, 16 F.4th at 718 (listing authority).

Means and Harvey had a tumultuous marriage, but it was not until their divorce proceedings that Means would begin to characterize Harvey's conduct as

emotionally abusive. The Court does not doubt Means's subjective beliefs, but the objective record is lacking from which to find that Harvey's treatment of Means posed a grave danger to the children. For example, there is nothing in the record reflecting that any form of spousal abuse occurred in the children's presence. And while Means claims that Harvey emotionally abused her, she does not allege that he emotionally abused the children.

Means cannot link the conduct she allegedly suffered to any potential risk posed to the children. Whatever the dynamic was between Means and Harvey, it appears limited to their private interactions, and now that they are separated, the risk of the children suffering as collateral damage to their fighting is greatly diminished.

### 2.2.3   Alleged sexual abuse.

Finally, Means raises the same allegation she raised in the Scottish court—that Harvey sexually abused Z.H.M. in April 2020 based on blood found in her underwear. Means also testified about two other incidents involving Harvey and the children that gave her pause. Means admits, however, that she has no physical evidence of sexual abuse and that she does not suspect Harvey sexually abused the children on any other occasion.

Harvey offered a plausible alternative explanation for the blood in Z.H.M.'s underwear. Earlier that day, he claims Z.H.M. fell off her piano bench, which stands around seven and a half inches off the ground. He believes the blood came from a straddle injury. Harvey told Means about the blood right after he discovered it. A

doctor examined Z.H.M. two days after the injury and found no external or internal signs of sexual abuse. A social worker also investigated and found no abuse. The Scottish court dismissed these allegations as false.

Sexual abuse by a custodial parent qualifies as both a grave risk of physical and psychological harm and an intolerable situation. *Ortiz v. Martinez*, 789 F.3d 722, 728 (7th Cir. 2015).

This Court takes seriously its independent obligation to ensure the children will not face a grave risk of harm if returned to Scotland, but the burden imposed on Means to establish the grave risk exception is high and she has not met it here. For example, in *Ortiz,* the Seventh Circuit found clear and convincing evidence of grave risk when the respondent mother described how she had seen the father molesting the child in the shower, she had overheard the child tell her father not to touch her anymore, and the child had exhibited behavior consistent with having suffered sexual abuse. *Id.* at 724-25.

In contrast, in *Kufner v. Kufner,* the First Circuit affirmed the district court's finding of *no* grave risk when the petitioning father had dozens of nude photos of the children on his computer, including four graphic photographs, the children began exhibiting physical symptoms such as bed-wetting, nervous eye twitching, sleeplessness, and nighttime crying and screaming after avacation with the father. 519 F.3d 33, 35-36 (1st Cir. 2008).

Here, all witnesses testified that Harvey had a normal and healthy relationship with his children. It was Harvey that first noticed the blood in Z.H.M.'s underwear and brought it to Means's attention, asking her for help. This shows an

ORDER GRANTING PETITION FOR RETURN - 15

appropriate level of concern for Z.H.M.'s well-being. Harvey testified that he believes a "straddle-injury" caused the bleeding. *See Cuellar v. Joyce,* 596 F.3d 505, 510 (9th Cir. 2010) ("Well-cared-for children do occasionally have accidents….").

Rather than consulting with a healthcare provider, Means contacted the authorities to report suspected child abuse. Z.H.M. was physically examined by a pediatrician consultant two days later who found no internal or external signs of sexual abuse. Means does not dispute this finding, nor does the record show that she sought a second opinion or further medical care at any time for Z.H.M., including counseling, therapy, or a psychological examination. *See infra* Section 2.3.

The Court does not doubt Means's concern about the blood in Z.H.M.'s underwear, but the sexual abuse allegations came during a bitter custody dispute, in which she had a motive to accuse Harvey of wrongdoing. Under the circumstances, the Court finds Means's testimony less than credible and that the evidence—or her speculation about the cause of the blood—does not meet the clear and convincing standard.

**2.3  Means is not entitled to more time to secure a psychological assessments of the children.**

Means admitted that she did not have strong evidence to support her sexual abuse allegation. At the hearing, she expressed for the first time her belief that there is "greater evidence available" if the court would allow a forensic assessment of the children. Means claimed to be emailing with a doctor who could perform such

an evaluation, but until the hearing, she had neither proposed nor requested a psychological or physical assessment of the children.[2]

Means's request is too late and not well taken. Means has had actual notice of this case since at least November 20, 2023. Over Harvey's objections, the Court allowed the parties to engage in pre-hearing discovery. For over two months, Means failed to obtain an expert or treating provider to assess the children or testify at the hearing or even make such a request to the Court. Discovery has closed and the deadline for exchanging exhibit and witness lists has passed. Allowing Means to continue to seek an expert would thus prejudice Harvey and cut against the Conventions promise "'to use the most expeditious procedures available' to decide petitions." *Colchester*,, 16 F.4th 712, 717 (9th Cir. 2021) (citing Hague Convention, arts. 2, 11, 19 I.L.M. at 1501–02).

In any event, neither the Hague Convention, ICARA, nor case law provide that, as a matter of right, the Court will appoint a forensic psychologist every time a respondent alleges the petitioner sexually abused the children. *See id.* In *Colchester,* the Ninth Circuit found that the district court abused its discretion through its "wholesale denial of discovery in general," and by denying the respondent mother's request for a psychological examination of the child when she raised "specific,

---

[2] Means previously requested that the Court interview the children *in camera,* which the Court declined to do for fear of doing more harm than good, but at no time prior did Means request a forensic evaluation of her children by a third-party evaluator. *See Kufner*, 518 F.3d at 40-41 (trial court did not abuse its discretion by declining to hear children's testimony "because of their young ages, lack of maturity, and susceptibility to parental influence," which rendered examination "harmful and pointless" under the circumstances).

ORDER GRANTING PETITION FOR RETURN - 17

corroborated allegations" of abuse. *Id.* at 727. The corroborated allegations included text and photo messages exchanged with the father, emails to domestic violence organizations, an audio recording, and a preliminary psychological examination that found the "possibility" of abuse and recommended further evaluation. *Id.* at 721-22. The Ninth Circuit held these errors caused the respondent mother "actual and substantial prejudice … since there is a reasonable probability that ordering the exam would have changed the result at trial." *Id.* at 727.

In contrast, in *West v. Dobrev*, the Tenth Circuit denied the respondent father's request for "an evaluation be performed by a child psychologist to determine the existence and extent of child abuse," finding that he offered no evidence of domestic violence or child abuse "sufficient to warrant further inquiry." 735 F.3d 921, 931-32 (10th Cir. 2013). "The Tenth Circuit therefore concluded that 'what Respondent really wanted was more time to investigate to determine if there has been abuse, and if so, what kind' and so 'refuse[d] to condone what appear[ed] ... under the totality of the facts presented [to be] a 'fishing expedition' on the part of Respondent designed to 'hook' an Article 13(b) defense." *Colchester,* 16 F.4th at 725 (quoting *West*, 735 F.3d at 931–32).

This case is more like *West* than *Colchester*. The doctor who physically examined Z.H.M. two days after blood was found in her underwear found no signs of sexual abuse. Perhaps because she does not dispute this finding, Means did not seek a second opinion. Likewise, she has pursued no counseling or therapy for the children in the two- and one-half years that followed, so she is unable to provide any assessments or records that reveal abuse, sexual or otherwise, of the children.

ORDER GRANTING PETITION FOR RETURN - 18

Means does not attribute any statements to Z.H.M. describing or complaining about abuse, and she testified that she suspects no other abuse.

In sum, Means has offered no specific, corroborated allegations of abuse to warrant a psychological evaluation, and certainly not one *post*-hearing. The Court has afforded Means sufficient time to obtain evidence and she has failed to do so within the time given. Her belief that abuse occurred is based on the same evidence presented to, and rejected by, the Scottish courts. Without more, her request for some undisclosed doctor to perform an assessment at some unknown time is a speculative inquiry at best and harmful to the children at worst.

**2.4      Harvey may move for attorneys' fees within 21 days of this order.**

If a court grants a petition for return under the Hague Convention, it must "order the respondent to pay necessary expenses incurred by or on behalf of the petitioner, including court costs, legal fees, . . . and transportation costs related to the return of the child, unless the respondent establishes that such order would be clearly inappropriate." 22 U.S.C. § 9007(b)(3). Accordingly, Harvey may move for appropriate attorneys' fees and costs within 21 days of this order. Means may oppose the motion by showing fees and costs would be clearly inappropriate.

### 3.   CONCLUSION

The Court is sympathetic to the plight of the parties, but "[a] court that receives a petition under the Hague Convention may not resolve the question of who, as between the parents, is best suited to have custody of the child." *Cuellar,* 596 F.3d at 508. The Scottish courts must answer that question.

Accordingly, the Court GRANTS Harvey's petition for return and ORDERS that:

1. Means must bring Z.H.M. and E.H.M. to Courtroom 16A of the U.S. District Courthouse, located at 700 Stewart Street, Seattle, Washington, at 3:00 p.m. on Monday, January 29, 2024.

2. Harvey must arrive at Courtroom 16A of the U.S. District Courthouse at 3:10 p.m., but not sooner, to take custody of Z.H.M. and E.H.M.

3. Z.H.M.'s and E.H.M.'s travel documents held by the Clerk of the Court must be returned to Harvey immediately.

4. Harvey must make all necessary arrangements for Z.H.M. and E.H.M.'s return to Scotland and report their return to the appropriate Central Authority.

5. Harvey's counsel must file a notice informing the Court within 48 hours of Z.H.M. and E.H.M.'s successful return to Scotland.

This order does not determine the merits of any custody issues within the meaning of Article 19 of the Hague Convention.

Dated this 29th day of January, 2024.

_____
Jamal N. Whitehead
United States District Judge